UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

UNITED STATES OF AMERICA      :

    -v.-                  :

CONSTANCE G. POST,         :     08 Cr. 243 (KMK)
  a/k/a "Gerrie Post," and
WAYNE CHARLES,           :

     Defendants.        :

-----------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' POST-TRIAL MOTIONS

PREET BHARARA
United States Attorney
for the Southern District of New York
Attorney for the United States of
      America

ANDREW S. DEMBER
CYNTHIA K. DUNNE
Assistant United States Attorneys
   - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

UNITED STATES OF AMERICA     :

    -v.-                                :

CONSTANCE G. POST,            :        08 Cr. 243 (KMK)
  a/k/a "Gerrie Post," and
WAYNE CHARLES,               :

      Defendants.             :

-------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' POST-TRIAL MOTIONS

The Government respectfully submits this memorandum of law in opposition to

the defendants' post-trial motions for a judgment of acquittal, pursuant to Rule 29 of the

Federal Rules of Criminal Procedure, and for a new trial, pursuant to Rules 33 of the

Federal Rules of Criminal Procedure. The defendants jointly move for a judgment of

acquittal with respect to Counts One and Two on the grounds that (1) the conspiracy and

substantive mail fraud charges were constructively amended by the Government by its

proof at trial or, in the alternative, the evidence at trial established facts different from

those alleged in the indictment resulting in a prejudicial variance, and (2) no part of the

remaining transactions alleged in the indictment and proven at trial occurred within the

statute of limitations. Defendant Post, alone, moves for a new trial on the grounds that

the Court failed to instruct the jury, and her attorneys failed to request an instruction –

that the statements of her co-defendant Wayne Charles that formed the basis of Count

Three of the indictment could not be considered as evidence against her – depriving her

of a fair trial. For the following reasons, these motions should be denied.

## Background

Following a five-week trial, the defendants were convicted of conspiracy to

commit mail fraud as well as a substantive count of mail fraud arising out of their corrupt

relationship in which Post, the Commissioner of the Mount Vernon Department of

Planning and Community Development ("MVCPD") and the Executive Director of the

Mount Vernon Department of Planning and Urban Renewal Agency ("MVURA"),

assisted Charles, a businessman who owned investment properties in, and did business

with the City of Mount Vernon, in obtaining contracts and a $500,000 loan from the City

of Mount Vernon. Charles was also convicted of making false statements to federal

agents.

The evidence at trial established that the defendants corruptly conspired to defraud

and defrauded the City of Mount Vernon and the United States Department of Housing

and Urban Development ("HUD"). The proof showed that the defendants concealed their

corrupt relationship from the City of Mount Vernon and HUD and that Post steered to

Charles millions of dollars in contracts and benefits through acts of concealment and false

statements. The evidence further established that both Post and Charles made numerous

false and misleading statements in order to induce the City of Mount Vernon to authorize the payment of HUD and City money to Charles and entities affiliated with Charles. Most of the monies that Post steered to Charles came from a computer services contract and from a $500,000 loan.

**Micros Only**

The first series of corrupt and fraudulent transactions arose out of the awarding of a computer services contract and its extensions by the MVURA to a Charles company. Post steered the computer services contract to Charles, who had no computer services company at that time, no previous experience in the computer field, and no employees, through an entity known to the City as "Micros Only." In attempting to convince the MVURA Board to award the contract to Micros Only, Post falsely told the Board members that a computer services contract had been advertised through a "Request for Proposal" (a competitive bidding process), she had received only two bids and that the entity that she recommended for the contract was Micros Only. (GX 102, GXs 102A-E). The evidence established that in fact Micros Only was a defunct company formerly owned by Charles' friend Dante Brown, was no longer in operation, and did not submit a bid for that contract with the City. (Tr. 128, 130, 141-42). Contrary to Post's representation, the computer contract had neither been advertised nor publicized in any competitive bidding process. (Tr. 252-57, 300, 306-07). After the Board authorized the Micros Only contract, Post subsequently requested that the Board extend the contract on a

3

number of occasions, which ultimately, resulted in the payment of over $1 million of HUD money under Post's control to Charles for supposed necessary computer-related services. (GX 105, GXs 105A-C, C-1; GX 112, GXs 112A-C, C-1; GX 120, GXs 120A-D,. D-1; GX 130, GXs 103A-C, C-1).

In requesting that the MVURA Board extend the contract with Micros Only a number of times, Post made various material false statements and omissions to the Board. Perhaps the most egregious omission occurred at a Board meeting in December 2000, when Post sought to extend the Micros Only contract for a fourth time. (GX 120, GXs 120A-D, D-1). Up until that time, while the Board had authorized Post to pay Micros Only a total of $80,125 based on the original contract and three extensions, Post had in fact paid a total of $321,541 to Micros Only. (GX 30D). When Post sought a fourth extension of the contract, she deliberately concealed from the Board that she had paid Micros Only approximately $240,000 more than was authorized. (GX 120, GXs 120A-D, D-1). The Board, having no knowledge of that, approved another contract extension which did not have a monetary limit. (GX 120, GXs 120A-D, D-1). Over the next fifteen months, Post paid Micros Only a total of $635,496. (GX 30D).

As the evidence clearly established, Charles and Post took various steps to affirmatively conceal Charles's ownership of and involvement with Micros Only. They represented to the MVURA that a "William Brown," the name of a brother of Charles, and others were in charge of the company. Micros Only vouchers, which Charles

4

submitted to Post and Post approved for payment, bore the signature of a "William Brown," on behalf of Micros Only. (GXs 200-383). The evidence established that "William Brown" was a false name that Charles used. (Tr. 1335-37, 2682-83; GX 200-383, GX 500K-M, GX 500Q, GX 500BB, GX 500HH, GX 518, GX 532). When Michael Leigh, a computer consultant paid by Micros Only, referred to Charles by his true name in relation to Micros Only during a meeting with various MVURA officials including Post, Post removed Leigh from the meeting and angrily admonished him never to mention Charles's name. (Tr. 995-98, 1730-31). Also, during the course of the scheme, in order to conceal Charles's involvement, Post introduced Yigal Joseph, a New York City Board of Education official, to other MVURA officials and employees as the owner of Micros Only. (Tr. 632-33). Charles eventually admitted to federal agents that during the relevant time period he had "tried to help" Micros Only and that the "William Brown" signatures that appeared on the Micros Only correspondence and vouchers might have been signed by him. (Tr. 3313-15).

The proof, of course, established that Charles was the owner of Micros Only and that he controlled the more than $1 million that Micros Only was paid by the MVURA. Charles incorporated an entity named Micros Only Computer Concepts, Inc. in the State of New York and had his sister, Susan Saahir open and maintain a checking account in that name, which Charles used to deposit MVURA checks made payable to Micros Only. (Tr. 391, 393-413, 462; GX 593, GX 593S, GX 2600). As the evidence proved, while

Saahir was the sole signatore on the account, all disbursements made by her from the account were at Charles's direction. (Tr. 421-24; GX 2600).

In addition to concealing Charles's involvement with Micros Only and paying Micros Only far more than the MVURA Board had authorized, Post also assisted Charles in defrauding the City of Mount Vernon and HUD by recruiting and hiring persons to "work" for Micros Only, including Michael Leigh, Gary White, and Yvonne Ross. (Tr. 774-79, 953-66, 2180-84). Leigh and White were hired by Post and the MVURA independent of Micros Only and were only placed on the Micros Only payroll to enrich Charles who billed for their services far in excess of what they individually billed. (Tr. 973-77, 2181-86, 2192; GX 200-383). In addition, White was an accountant and did not provide computer services to the MVURA. (Tr. 2178, 2190-95, 2435-37).

**The Charles Group Loan**

The second corrupt series of transactions in the defendants' scheme involved a loan to rehabilitate Mount Vernon property owned by Charles at 3 East 3rd Street (the "Third Street Property"), a multi-unit property that he purchased, in part, with the proceeds of the Micros Only fraud. At the inception of this part of their scheme, Post and Charles were already engaged in defrauding the City of Mount Vernon and HUD through the Micros Only contract. Post obtained authorization from the MVURA Board to lend Charles $500,000 for materials to renovate the Third Street Property. In obtaining the loan, Post and Charles concealed the fact that he was the owner of Micros Only and was

using a false name in conducting business with the MVURA. (Tr. 1712-19; GX 1072, GX 1072A). Post and Charles also had Charles complete a number of documents necessary to close on the loan in which he lied to the MVURA about serving as a consultant to Mount Vernon or having any business dealings with Mount Vernon and that he was not known by or used any other names. (Tr. 1712-19; GX 1072, GX 1072A).

In contrast to all of the other loans extended by the MVURA, the Charles Group loan was not recorded in the City's books and records as a receivable, even after CPC repaid $250,000 of the loan. In fact, after the CPC payments were received (two checks, one for $250,000 and a second for the loan interest), Post directed that those payments be booked in such a way as to disguise the existence of the loan. (Tr. 2299-2317, 2455-58; GX 8003A). She did this to enable Charles to enrich himself and avoid making payments on the loan. Post, who regularly monitored the status of all outstanding loans on a monthly basis, never took any action whatsoever to see that the Charles Group loan was either docketed or collected from Charles. (Tr. 1955-59, 2214). Only after federal agents began questioning the City's use of HUD funds, Post directed an employee to docket the loan on the City's books. (Tr. 1959-62, 2216-20). Only then did Charles then make his first and final few payments to the City and initiated a flurry of letters, claiming that he had no idea how much he was supposed to pay monthly, because he had not been provided with monthly bills. (Tr. 1961-74, 2321-22; GX 1312A, GX 1314, GX 1315, GX 1315A).

**Wick Security**

The evidence also established that in 2001-2003 the City paid over $700,000 to WICK Security, another Charles entity, to provide security for its City parking garages. (GXs 1641-1646). This 404(b) evidence was offered as proof of the defendants' fraudulent intent and knowledge. This evidence established that prior to obtaining the Board's approval to make the award, Post and Charles hid Charles' role in the company, which appeared to be run by others. (Tr. 2540-44; GX 1608, GX 1611, GX 1612). This contract, which was under the jurisdiction of the City's Board of Estimates, was awarded to WICK, in part, because Post vouched for the company. (Tr. 2538-39; GX 1613A). After the contract was awarded to WICK, Charles' affiliation with the company first became known to a handful of City employees. (Tr. 2544-46). Contrary to Post's representations about the operations of WICK, WICK Security never had done any business prior to when it obtained the City contract. (Tr. 2478-81, 2643-48; GX 1600).

**The Financial and Personal Relationship**

The evidence also established that by in or about 1999, Charles and Post had become romantically involved, a relationship that continued throughout the course of the relevant time period. (Tr. 1340, 3078-79). In later years Post and Charles secretly entered into a partnership to purchase, develop and rehabilitate commercial and residential properties, locally and elsewhere. The defendants traveled to South Carolina to inspect properties and they negotiated with sellers and Realtors to purchase various

8

properties. (Tr. 1650-55, 1685, 1689-96; GX 50-D). One property that they visited was a property that Charles had purchased, at least in part, with the proceeds of the Micros Only fraud. (Tr. 1350; GX 30-I). In 2004, after Charles had received almost $2 million from the City, and while Charles was not being asked or required to repay the $250,000 balance of the loan from the City, he gave Post $31,000. (GXs 2101A-C).

Post never disclosed to HUD or the City that she had either a personal or financial relationship with Charles. (Tr. 2286-94, 3306-07). Throughout the relevant time period, Post annually certified to HUD and the City's accountants that she did not know of any conflicts of interest in matters under her supervision. (Tr. 2922-24, 2928-30, 2930-32, 2940-41; GX 4100A, GX 4501A, GX 4200A, GX 4300A). In keeping with her pattern of deception, throughout her tenure, Post failed to file annual City financial disclosure forms, as were required by her position. (Tr. 2286-94, 3306-07).

## Argument

## Point I

## The Evidence At Trial Did Not Vary From The Indictment

The defendants first argue that their convictions on Counts One and Two must be set aside because the proof at trial constructively amended the indictment or created a prejudicial variance. They further claim that, as a result, the Government's remaining evidence involved criminal transactions that occurred beyond the statute of limitations

requiring the that the convictions on Counts One and Two be set aside. The defendants are wrong.

**Applicable Legal Principles**

When the trial evidence or the jury charge operates to "broaden[] the possible bases for conviction from that which appeared in the indictment," the indictment has been constructively amended. *United States* v. *Miller*, 471 U.S. 130, 138 (1985); *United States* v. *Milstein*, 401 F.3d 53, 65 (2d Cir. 2005). To prevail on a constructive amendment claim, "a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States* v. *Frank*, 156 F.3d 332, 337 (2d Cir. 1997); *accord United States* v. *Vebeliunas*, 76 F.3d 1283, 1290 (2d Cir. 1996). The prohibition against constructive amendments rests upon two concerns: that the defendant be tried only for crimes charged by the grand jury, and that the defendant have adequate notice of the nature of those charges. *See United States* v. *Wallace*, 59 F.3d 333, 337 (2d Cir. 1995). In constructive amendment jurisprudence, the Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." *United States* v. *Patino*, 962 F.2d 263, 266 (2d Cir. 1992) (internal quotation marks omitted). There is no constructive amendment "where a

10

generally framed indictment encompasses the specific legal theory or evidence used at trial." *United States* v. *Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003).

In contrast, a "variance" of an indictment "occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States* v. *Zingaro*, 858 F.2d 94, 98 (2d Cir. 1988) (quoting *Gaither* v. *United States*, 413 F.2d 1061, 1071 (D.C.Cir. 1969)), *see also United States* v. *Attanasio*, 870 F.2d 809, 817 (2d Cir. 1989). Whereas a constructive amendment *per se* violates the grand jury guarantee of the Fifth Amendment, a variance violates this guarantee only when the defendant can demonstrate substantial prejudice. *Id.*; *United States* v. *McDermott*, 245 F.3d 133, 139 (2d Cir. 2001). Thus, where an indictment gives insufficient notice of the offense charged, the resulting prejudice requires reversal of the conviction. *Id.*

There was no constructive amendment here because neither the evidence nor the jury instructions modified the essential elements of the offenses charged. Similarly, because the evidence offered at trial did not prove facts materially different, or for that matter, at all different from those alleged in the indictment, there was no variance.

**The Indictment**

The defendants' claim of error involves the proof at trial regarding the $500,000 loan that Charles and Post fraudulently obtained for Charles from the MVURA. Specifically, the defendants appear to contend that the fraudulent activity proven involved

a different loan transaction than that alleged in the indictment. (Def. Motion, pages 5-7). The Indictment alleges one loan and as the government proved at trial, there was only one loan, a loan for $500,000. Contrary to the defendants' assertion, with respect to that loan, the allegations in the indictment are consistent with the evidence presented at trial.

The indictment alleges that the MVURA made a single loan of $500,000 to the Charles Group in 1999. More specifically, the indictment alleges that in or about July 1999, Post recommended to the MVURA that it loan the Charles Group $500,000 to assist in the rehabilitation of commercial and residential property owned by Charles at 3-5 East Third Street in Mount Vernon (the "Third Street Property"). *See* Indictment, ¶¶ 10, 11. By a resolution dated October 19, 1999, the MVURA approved Post's proposal and authorized the $500,000 loan. *See* Indictment, ¶ 11. Among the conditions of the loan was that upon completion of the construction on the Third Street Property, through a designated private funding source, the Charles Group was required to repay one-half of the loan – $250,000 – to Mount Vernon. *See* Indictment, ¶ 11b.

The indictment further alleges that, pursuant to the loan agreement between the MVURA and the Charles Group, from August 2000 through in or about August 2003, Post directed the MVURA to pay out the loan proceeds totaling $500,000 to the Charles Group. *See* Indictment, ¶ 12. As alleged in the indictment, the loan, however, was not reflected in the books and records of the MVURA. The indictment states that after the construction of the Third Street Property was completed, pursuant to the loan agreement,

12

a private funding source repaid $250,000 of the loan and Charles continued to owe the City of Mount Vernon the remaining $250,000 plus interest. *See* Indictment, ¶ 12. According to the indictment, after Post was contacted by federal investigators, the Charles loan was first entered into the books and records of the MVURA and only then did Charles make a series of five payments, totaling approximately $7,400 on the loan beginning on or about September 27, 2005 and ending on or about February 1, 2006. No further payments were made. *See* Indictment, ¶ 13.

### The Trial Evidence

The evidence at trial regarding the $500,000 loan did not deviate from the allegations in the indictment. That evidence established the following.

On July 31, 2000, the MVURA and Charles entered into a loan agreement in which the MVURA would loan $500,000 to the Charles Group for construction materials only for the rehabilitation of the Third Street Property, the repayment of which was personally guaranteed by Charles. (Tr. 2050, 2733-34; GX 1070-A). According to the agreement, Charles was to act as his own contractor and the loan proceeds were only to be expended for materials and not for labor. (Tr. 2050, 2735; GX 1070-A). Furthermore, the loan agreement explicitly contemplated that a designated private funding source, in this case the Community Preservation Corporation ("CPC"), a not-for-profit mortgage finance company, would come in at the completion of the construction and repay a portion of the loan ($250,000) plus interest to the MVURA. (Tr. 1705, 2735-36, 2822-

23; GX 1070-A). The remaining balance of the loan – $250,000 – was to be repaid by Charles to the MVURA. (Tr. 1706). At the closing on the loan, besides entering into a loan agreement, the MVURA and the Charles Group also entered into a mortgage and a mortgage note, and Charles, individually provided the MVURA with a personal guarantee of repayment. (Tr. 2736-38; GX 1070-A).

Following the loan closing on July 31, 2000, the loan proceeds were paid to Charles when he purchased materials for the rehabilitation of the Third Street Property and provided the MVURA with evidence of those purchases. (Tr. 1706-7, 1713). In order for there to be a drawdown on the loan and for loan proceeds to be distributed to Charles, a Mount Vernon inspector would go to the Third Street Property, conduct a progress inspection to ensure that work was being done and obtain from Charles the documentation evidencing the purchase of building materials. (Tr. 2047, 2054-55, 2056, 2102). Charles would then request a drawdown of the loan in the amount of monies expended on materials. (Tr. 2056, 2102). Once an inspection was done, Louis Albano, the Director of Housing Programs who managed this loan, would prepare a voucher to disburse the loan proceeds and provide it to Post, who was responsble for authorizing the disbursement of the loan proceeds. (Tr. 1723, 2036, 2054, 2055, 2103). The full $500,000 loan was paid out to Charles by August 13, 2003, when the final loan payment, a check for $35,062.29 was issued to Charles. (Tr. 2099-2101; GX 1423). The proceeds

of the loan were drawn down from Community Development Bloc Grant funds, which were federal funds provided by HUD. (Tr. 2001-2).

The construction on the Third Street Property was completed in 2003 (Tr. 2057). Following the completion of the construction, a second closing, commonly referred to as a "take-out closing" took place in September 2003. (Tr. 2057-58, 2739-41). At that closing, as contemplated by the original loan agreement, CPC entered into an agreement with the Charles Group and repaid to the MVURA on Charles's behalf a portion of the loan the MVURA had provided to Charles. (Tr. 2056, 2824, 2826-7). At that time, the CPC provided the MVURA with two checks, one for $250,000, representing the repayment of one-half of the loan, and a second check for $19,000 for the loan interest that Charles had failed to pay during the preceding months of the loan. (Tr. 2060, 2098, 2742, 2824; GX 1230). Also at that time, the MVURA and the Charles Group executed a new mortgage and mortgage note for $250,000, the balance of the original loan that Charles Group still owed to the MVURA, with CPC now having paid one-half of the loan to the MVURA on behalf of the Charles Group.[1] The new mortgage and mortgage note, replaced the ones originally entered into on July 31, 2000, as was contemplated by the original loan agreement. (Tr. 2742-50; GX 1231, GX 1241). After this second closing,

---

[1] At the September 2003 closing, the Charles Group also entered into a $638,000 agreement with CPC for permanent financing, which included a mortgage. (Tr. 2741-42; GX 1231-A). The second mortgage document between the Charles Group and the MVURA was subordinated to the mortgage executed in favor of CPC. (Tr. 2746-47; GX 1231).

which subordinated MVURA's mortgage on the Charles Group loan and gave CPC a first

mortgage on the Third Street Property, the Charles Group continued to owe the MVURA

the remaining balance of the original loan of $500,000 – $250,000. The MVURA did not

make a second loan to the Charles Group at that time or any time thereafter. (Tr. 2775-

76, 2781-82).

**Discussion**

The defendants argue a variance or amendment to the indictment because "[t]he

indictment never mentions the September 2003 loan, September 2003 mortgage, or the

September 2003 note." (Br. at 6). The defendants claim that these omissions from the

indictment were significant because (1) it concealed the fact the fact that the $500,000

loan to the Charles Group was satisfied and discharged and (2) concealed the fact that the

evidence of the improper booking of the loan in 2003 did not relate to the $500,000 loan

but to the $250,000 loan. (Br. 6). These claims are utterly meritless.

In the first instance, the defendants' constructive amendment claims fail because

they have failed to "demonstrate that the proof at trial . . . so altered an essential element

of the charge that, upon review, it is uncertain whether the defendant[s were] convicted of

conduct that was the subject of the . . . indictment." *United States* v. *Frank*, 156 F.3d at

337; *United States* v. *Vebeliunas*, 76 F.3d at 1290. Indeed, the defendants have failed to

even address this standard in their motion papers. What is clear from the indictment and

proof at trial is that the defendants were "given [more than adequate] notice of the core of

criminality to be proven at trial" with respect to the MVURA loan in this case, defeating any claim of a constructive amendment. *United States* v. *Patino*, 962 F.2d at 266.

Nor was there a variance of the indictment because the evidence introduced at trial proved facts that were consistent with those alleged in the indictment. Moreover, the defendants claim of a variance with respect to the evidence of the MVURA loan should also be rejected because they have failed to "demonstrate substantial prejudice" as a result of the supposed variance. Indeed, they did not and cannot show any prejudice, let alone substantial prejudice.

As the indictment alleged and the evidence clearly established beyond a reasonable doubt, there was only one loan made by the MVURA to the Charles Group, not two as claimed by the defendants. Contrary to the defendants' claim, after the completion of the construction at the Third Street Property in 2003, the MVURA did not provide Charles with a second loan of any kind. Although the original mortgage and mortgage note entered into between Charles and the MVURA in 2000 were technically satisfied (in order to subordinate MVURA's interest in the property to CPC and to reflect CPC's payment to the MVURA of $250,000 on behalf of Charles which, in turn, lowered the outstanding balance of the Charles loan to $250,000) this transaction did not change the fact that (1) the one and only loan made in this case had not been satisfied or discharged and (2) that a new loan had not been made.

As the evidence clearly established, by the September 2003 closing, all of the loan proceeds had been paid to Charles and, at the closing, CPC paid off one-half of the loan that Charles received from the MVURA. Charles continued to owe the MVURA $250,000 from the loan made in 2000. Thus, the indictment was not constructively amended and there was no variance.

Finally, the defendants argue that because of the claimed variance, the prosecution of the remaining conduct – the Micros Only and architectural services transactions – which ended in 2002 was untimely and barred by the statute of limitations. This argument, of course, is premised on the Court finding a variance or constructive amendment to the indictment, as claimed by the defendants, requiring that the Court disregard the proof of the loan. Having established that the evidence of the loan presented at trial did not vary from the allegations in the indictment, the defendant's claim, that the limitations period had expired more than five years before the filing of the indictment, is meritless. As the trial evidence established, the defendants engaged in the conspiracy to commit mail fraud and committed mail fraud with respect to the loan well after the March 19, 2003 limitation date.

Accordingly, for the above reasons, the defendants' motion for acquittal on Counts One and Two should be denied.

## Point II

### Post Is Not Entitled To A New Trial Based On The Failure Of The Court To Instruct The Jury Regarding Charles' Statements

Defendant Post moves for a new trial claiming she was denied a fair trial based on the fact that the Court failed to instruct the jury that the statements of her co-defendant Charles, that formed the basis of Count Three of the indictment, could not be considered as evidence against her. Post also claims that her attorneys provided ineffective assistance in failing to request such an instruction. These claims are meritless.

**Relevant Facts**

In its case-in-chief, the Government introduced three false statements made by Charles to HUD investigators during an interview conducted on March 20, 2006. (Tr. 3310). During the interview, the investigators asked Charles if he had ever had any business dealings with the MVURA. Concealing the fact that he was the principal of Micros Only, Charles falsely told the investigators that the only business dealings he ever had with the MVURA were a $500,000 rehabilitation loan and as a Section 8 landlord with tenants at his property on Third Street in Mount Vernon. (Tr. 3312). Charles was also asked if he had ever heard of Micros Only and he falsely responded that he had heard of the company, although he had no interest in it. (Tr. 3312). Charles was also asked if he was the owner of Micros Only and he falsely responded that he was not the owner and

that the principal owners of Micros Only were William Brown and his wife Blanche Brown. (Tr. 3312).

Based on our review of the trial transcript, Post never requested a jury instruction limiting the admissibility of these statements as only against Charles and one was not given.

**Discussion**

Post claims that she is entitled to a new trial on the grounds that the Court failed to give the limiting instruction in question and that her attorneys failed to request it. Federal Rule of Evidence 105 provides that when evidence which is admissible as to one party but not admissible as to another party is admitted, the court *"upon request"* shall restrict the evidence to its proper scope and instruct the jury accordingly. *See* Fed. R. Evid. 105. Here, Post was entitled on request to an instruction limiting the jury's consideration of Charles's statements, in accordance with Rule 105, yet failed to do so. Having failed to make such a request, Post cannot claim that the Court erred in not giving it.

Post's claim that her attorneys' failure to make such a request constituted ineffective assistance, is equally unavailing. Where, as here, a defendant fails to request an instruction, Rule 52(b) provides that a review of the issue is only for "plain error." *See* Fed. R. Crim. P. 52(b). As the Court is well aware, plain error "is a 'very stringent' standard requiring a 'serious injustice' or a conviction in ' manner inconsistent with fairness and integrity of judicial proceedings.'" *United States* v. *Walsh*, 194 F.3d 37, 53

(2d Cir. 1999) (quoting *United States* v. *Ramirez*, 973 F.2d 102, 105 (2d Cir. 1992)).

"The plain error doctrine is to be used sparingly," *United States* v. *Torres*, 901 F.2d 205,

228 (2d Cir. 1990), and that to warrant reversal, the claimed error must go to the "very

essence of the case." *United States* v. *Calfon*, 607 F.2d 29, 31 (2d Cir. 1979) (internal

quotation marks omitted); *United States* v. *Smith*, 918 F.2d 1032, 1038 (2d Cir. 1990).

"A 'plain' error is 'an error so egregious and obvious as to make the trial judge and

prosecutor derelict in permitting it, despite the defendant's failure to object." *United

States* v. *Gore*, 154 F.3d 34, 43 (2d Cir. 1998). "To establish plain error, a court must

find 1) an error, 2) that is plain, 3) that affects substantial rights." *United States* v. *Keigue*,

318 F.3d 437, 441 (2d Cir. 2003) (citations and internal quotation marks omitted); *accord

United States* v. *Olano*, 507 U.S. 725, 732-37 (1993). Under the plain error standard,

"[i]t is the defendant rather than the Government who bears the burden of persuasion with

respect to prejudice." *United States* v. *Olano*, 507 U.S. at 734.

The "[f]ailure to give limiting instructions is generally held not to be plain error."

*United States* v. *Bermudez*, 526 F.2d 89, 97 (2d Cir. 1975); *see also United States* v.

*Zagari*, 111 F.3d 307, 318 (2d Cir. 1997) (failure to give limiting instruction on the

purpose for which evidence was admitted deemed harmless error); *United States* v. *Jones*,

958 F.2d 520, 521 (2d Cir. 1992) (failure to giving limiting instruction on the purpose for

which evidence was admitted deemed not plain error); *United States* v. *Pittman*, 388 F.3d

1104, 1107 (7th Cir. 2004) (failure to give defense requested limiting instruciton with

respect to evidence of prior drug dealing admitted under Fed. R. Evid. 404(b) deemed

harmless error); *United States* v. *Brothers*, 955 F.2d 493, 496 (7th Cir. 1992) (failure to

give limiting instruction with respect to evidence admitted under Fed. R. Evid. 404(b) to

show motive and intent deemed not plain error).

Post's suggestion that she was denied a fair trial because the Court failed to give a

limiting instruction is baseless. Even if it was error to fail to give the instruction, it was

not plain error and Post is not entitled to a new trial because she was not prejudiced by the

failure and, in any event, the failure to give the instruction was harmless.

Post was not prejudiced by the Court's failure to instruct the jury that Charles's

statements to HUD investigators could not be considered as evidence against her. Post's

conclusory claim that Charles's statement were "devastating as to her," (Br. 14), simply

ignores the substance and import of those statements. Indeed, Posts's failure to explain in

her motion papers how these statements were "devastating" to her defense belies her

claim. In fact, the statements themselves were not "devastating" and did not prejudice

Post in any way because they were personal to Charles, concerning his individual dealings

with the MVURA and his supposed lack of personal knowledge and involvement with

Micros Only. There was no direct or indirect reference to Post in any of the statements

Charles made to the investigators. Post's claim, that Charles's attorney's reference to her

in a single question posed to Agent Huvane, (Br. 12) – which the Government objected

to and the agent did not answer – somehow prejudiced her is baseless.[2] Post claims "[t]he attorney moved on, but the damage was done." (Br. at 12). But Post does not explain how the reference to Post in a single question caused her "damage," thus failing to carry her burden of establishing prejudice. *United States* v. *Olano*, 507 U.S. at 734. In any event, the question was never answered and shortly thereafter, during the same witness examination, the Court reminded the jury that "what the lawyers say is not evidence[,]" (Tr. 3336), thereby eliminating any possibility of prejudice.

---

[2] The questioning of Agent Huvane referred to by Post in her motion went as follows:

Q.   He told you that he first got involved with Micros Only at a function, correct?

A.   That's correct.

Q.   He said that he had learned from Commissioner Post that their computer system needed to be updated; is that right?

    MS. DUNNE:       Objection. Bruton.

    MR. LEVITT:       I'm sorry?

    THE COURT:       You might want to consult with counsel on this one.

    MR. LEVITT:       Oh, I'm sorry. Okay. Absolutely.

    THE COURT:       Thank you, Ms. Dunne.

    MR. LEVITT:       Yes. No, I understand.

(Tr. 3328).

In addition, the Government advanced no argument to the jury in either of its summations that Charles's three false statements should be considered against Post. Indeed, there was only two references to Charles's statements in the two Government summations. In its first summation, the Government referenced Charles's admission to Agent Huvane that he had used the name "William Brown" in arguing that he had concealed his involvment in the Micros Only scheme. (Tr. 3432). In its rebuttal summation, the Government discussed the falsity of the three statements in arguing that Charles was guilty of Count Three. (Tr. 3730-32).

Finally, given the substance of the three Charles statements and the absence of any reference to Post in them, even without an instruction from the court, it is highly unlikely that the jury would have considered them as evidence against Post. More logically, the jury viewed Charles's false statements as his attempt to conceal his own wrongdoing and as evidence of his consciousness of guilt. Because the three false statements were the subject matter of Count Three of the indictment, in which only Charles was charged, it is more likely that the jury limited their consideration of this evidence to that charge.

In any event, even if the failure to provide the instruction in question was error, it was harmless because the evidence of Post's guilt on Counts One and Two was simply overwhelming. The evidence concerning Post's involvement in the Micros Only aspect of the scheme established, among other things, that Post (1) steered the computer services contract to Charles; (2) recruited and hired employees for Charles to use to carry out their

24

scheme, including Michael Leigh, Gary White, and Yvonne Ross; (3) concealed the fact

that Charles did not have a computer services company or any experience in the computer

services field; and (4) concealed the fact that Charles was the owner of Micros Only,

creating correspondence with the name William Brown on it and introducing Yigal

Joseph to MVURA officials and employees as the owner of Micros Only. (Tr. 128, 130,

141-42, 632-33, 953-66, 995-98, 774-79, 1730-31, 2180-84). Post also concealed from

the MVURA Board, that by December 2000, in order to enrich Charles, she had

authorized payments and in fact paid Micros Only $321,541 when the MVURA had only

authorized payments up to $80,125 up to that point in time. At that time, having

concealed from the MVURA Board that Micros Only had been grossly overpaid, she

convinced the Board to once again to extend the Micros Only contract, but this time

without a monetary limitation. (GX 120A-D, GX 30D). In the next fifteen months, Post

paid Micros Only $635,496. (GX 30D).

The evidence of Post's participation in the loan part of the scheme was similarly

overwhelming. In seeking approval for the $500,000 loan for Charles, Post concealed

from the MVURA Board the fact that Charles was the owner of Micros Only which had

an ongoing contract with the MVURA to provide computer services. (GX 1712-19; GX

1072, GX 1072A). Post also reviewed and approved documents submitted by Charles in

order to close on the loan in which Charles lied about having any other business dealings

with the MVURA and Mount Vernon and using a different name. (Tr. 1712-19; GX 1072,

GX 1072A). Finally, once the loan was approved and provided to Charles, Post concealed the existence of the loan by ensuring that the loan was not recorded in the MVURA's books and records as a receivable, even after CPC repaid one-half of the loan. (Tr. 1955-59). Indeed, the evidence clearly established that after the MVURA received the CPC payments, Post directed that those payments be recorded in such a way as to disguise the existence of the loan. (Tr. 2299-2317, 2455-58; GX 803A). Similarly, even though the Charles loan was one of the largest made by the MVURA, Post took no steps to collect on it until auditors from HUD came to the MVURA. (Tr. 1955-59).

Accordingly, based on the overwhelming evidence of Post's guilt, any error in failing to instruct the jury as to the admissibility of Charles's statements was harmless.

### Conclusion

For the reasons set forth above, the Court should deny the defendants's post-trial motions in their entirety.

Dated: White Plains, New York
April 5, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _Cynthia Dunne_
ANDREW S. DEMBER
CYNTHIA K. DUNNE
Assistant United States Attorneys
Telephone: (212) 637-2563 /(914) 993-1913